J-S04039-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                           :           PENNSYLVANIA
                                           :

            v.                                   :
                                           :

LEWIS REGINALD FOWLER            :
                                         :
          Appellant            :      No. 941 MDA 2020

Appeal from the Judgment of Sentence Entered June 23, 2020
In the Court of Common Pleas of Adams County Criminal Division at
No(s): CP-01-CR-0000970-2019

BEFORE: OLSON, J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:           **FILED MARCH 02, 2021**

Lewis Reginald Fowler ("Fowler") appeals from the judgment of sentence entered following his conviction of two counts of driving under the influence ("DUI") of alcohol – general impairment, three counts of DUI – controlled substance, and one count each of DUI – combination, proper class of license required, and driving vehicle at safe speed.[1] We affirm.

During the stipulated bench trial, the parties stipulated to the following facts:

> 1. Officer [Gregory] Morehead [("Officer Morehead")] was, at all times relevant to the instant proceeding, employed by the Reading Township Police Department and on active duty.
>
> 2. Officer Morehead has approximately 19 years of training and experience, including approximately 80 DUI investigations.

---

[1] *See* 75 Pa.C.S.A. §§ 3802(a)(1), (d)(1)(i), (d)(1)(iii), (d)(2); 1504(1); 3361.

3. On June 2, 2019, at approximately 3:00 [p.m.], … Fowler[] and his wife[, Danielle Fowler ("Danielle"),] were involved in a motor vehicle accident while riding on a motorcycle[,] operated by Fowler[,] at the time of the accident.

4. The accident took place on a public trafficway at the intersection of Rife Road and Ruppert Road, located in Reading Township, Adams County, Pennsylvania.

5. Officer Morehead was dispatched to the scene and observed an individual, who was later identified as Fowler, lying on his back with a severe right ankle injury and in clear pain.

6. Fowler was responsive to Officer Morehead's questions but had sustained what would later be determined to be a compound fracture of his leg.

7. Officer Morehead observed the odor of alcohol on Fowler's breath while speaking with him.

8. Fowler indicated that he and [Danielle] were coming from the Smoke House bar and had consumed alcohol there[,] as well as CBD oils prior in the day.

9. Fowler was transported to York Hospital via ambulance, and was given fentanyl while en route.

10. Officer Morehead formed the opinion[,] in light of his training and experience, that Fowler had imbibed a sufficient amount of alcohol so as to render him incapable of safely operating his motorcycle.

11. A blood draw collected within two hours of Fowler's driving was analyzed and revealed that Fowler had a Blood Alcohol Concentration [("BAC")] of .096%, as well as THC with related metabolites, which are schedule I controlled substances, and [f]entanyl[2] with related metabolites in his blood.

---

[2] The suppression court noted in its Opinion that paramedics administered two doses of fentanyl, totaling 50 mg, while transporting Fowler to the hospital. Suppression Court Opinion, 12/4/19, at 2.

12. Officer Morehead was able to determine that Fowler did not have a valid motorcycle license or permit at the time of the accident and was traveling at excessive speed.

Commonwealth Exhibit 1 (Stipulations in Lieu of Testimony at Bench Trial), 6/23/20, at 1-2 (unnumbered) (footnote added).

On October 15, 2019, Fowler filed a Motion to Suppress the results of his blood test. Specifically, Fowler argued that his consent to the blood draw was not knowingly, voluntarily and intelligently given, because he "was going in and out of consciousness and had just been administered fentanyl by paramedics." Motion to Suppress, 10/15/19, at 2 (unnumbered). The suppression court conducted a hearing, and subsequently denied Fowler's Motion to Suppress.

Following a bench trial, Fowler was convicted of the above-mentioned offenses. For his DUI – controlled substances conviction under section 3802(d)(1)(i), the trial court sentenced Fowler to a term of 6 months' probation, with the first 10 days to be served on house arrest with electronic and SCRAM[3] alcohol monitoring.[4] The trial court also ordered Fowler to pay a $1,000 fine, plus fees and the costs of prosecution. Further, Fowler was

_____

[3] SCRAM is a Secure Continuous Remote Alcohol Monitor system, often used as a supervision tool for individuals who have committed alcohol-related offenses. *See* ABOUT SCRAM SYSTEMS, https://www.scramsystems.com/our-company/aboutus.

[4] The remaining DUI convictions merged with Fowler's section 3802(d)(1)(i) conviction for sentencing purposes.

directed to undergo a drug and alcohol evaluation and to comply with recommendations, to attend safe driving school, and to consume no alcohol or controlled substances.

Fowler filed a timely Notice of Appeal and a court-ordered Pa.R.A.P. 1925(b) Concise Statement of errors complained of on appeal.

Fowler now raises the following question for our review:

Whether the trial court erred by not suppressing the blood results, because [Fowler's] consent was not knowing, voluntary and in an intelligent fashion, as a result of [Fowler] suffering the effects of a compound tibia fracture, going in and out of consciousness and being under the influence of the fentanyl that paramedics had recently administered[?]

Brief for Appellant at 6.

Fowler claims that his consent to the blood draw was not knowingly, voluntarily and intelligently given, and therefore, the blood test results should have been suppressed. *Id.* at 11. Specifically, Fowler argues that

he was suffering [from] the effects of a compound tibia fracture, [was] going in and out of consciousness and was under the influence of an unknown amount of fentanyl that paramedics had recently administered. Furthermore, the Commonwealth failed to prove by a preponderance of the evidence that [Fowler's] consent was knowing, voluntary and in an intelligent fashion because [it] did not present the amount of fentanyl [Fowler] was given, any medical professionals who treated [Fowler], or any medical experts who could speak to the effect of the administered amount of fentanyl—just simply an officer who gave his opinion based on three (3) one-word answers.

*Id.* Fowler points to testimony offered by Danielle, indicating that he was "loopy" after the fentanyl was administered. *Id.* at 13. According to Fowler, the evidence does not clearly support the suppression court's factual finding

- 4 -

that the quantity of fentanyl administered was 50 mg. ***Id.*** at 18. Additionally, Fowler argues that he "was suffering from a very serious injury that very reasonably could have put him in a state of shock…." ***Id.*** at 14.

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. The suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review. Moreover, appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress.

***Commonwealth v. Harlan***, 208 A.3d 497, 499 (Pa. Super. 2019) (citation and paragraph break omitted).

> The Fourth Amendment [to the Unites States Constitution] and Article 1, Section 8 [of the Pennsylvania Constitution] prohibit unreasonable searches and seizures. A search conducted without a warrant is deemed to be unreasonable and therefore constitutionally impermissible, unless an established exception applies. Established exceptions include actual consent, implied consent, search incident to lawful arrest, and exigent circumstances.

***Commonwealth v. Jones-Williams***, 237 A.3d 528, 537 (Pa. Super. 2020) (citations and quotation marks omitted).

Under Pennsylvania's implied consent statute, a motorist "shall be deemed to have given consent to one or more chemical tests of breath or blood for the purpose of determining the alcoholic content of blood or the presence of a controlled substance if a police officer has reasonable grounds to believe" that the motorist has committed a DUI offense. 75 Pa.C.S.A. § 1547(a); *see also id.* § 1547(b) (setting forth the civil penalties for refusal, and requiring the police officer to inform the motorist of penalties for refusal). This Court has previously explained the law regarding warrantless blood draws and consent as follows:

> In *Birchfield* [*v. North Dakota*, 136 S. Ct. 2160 (2016)], the Supreme Court of the United States held that criminal penalties imposed on individuals who refuse to submit to a warrantless blood test violate the Fourth Amendment (as incorporated into the Fourteenth Amendment). Within one week of that decision, the Pennsylvania Department of Transportation revised the standard consent form used by police, known as the DL-26 form, to remove the warnings mandated by 75 Pa.C.S.A. § 3804 that theretofore informed individuals suspected of DUI that they would face enhanced criminal penalties if they refused to submit to a blood test in order to comply with *Birchfield*. The revised form is known as Form DL-26B.

> * * *

> This Court subsequently held that enhanced criminal penalties imposed for failure to consent to a blood draw constituted an illegal sentence because of *Birchfield*. *See Commonwealth v. Giron*, 155 A.3d 635, 639 (Pa. Super. 2017).

> On July 20, 2017, Governor Thomas W. Wolf signed into law Act 30 of 2017, which amended 75 Pa.C.S.A. § 3804 to comport with *Birchfield*. Specifically, Act 30 provides for enhanced criminal penalties for individuals who refuse to submit the blood tests only when police have obtained a search warrant for the suspect's blood. *See* 75 Pa.C.S.A. § 3804(c). Hence, from July

- 6 -

20, 2017 onwards the DL-26B form conforms to the revised statutory law.

*Commonwealth v. Krenzel*, 209 A.3d 1024, 1028 (Pa. Super. 2019) (some citations and brackets omitted).

Further, "the statutory right of refusal applies to all DUI arrestees without regard to an arrestee's state of consciousness[.]" *Commonwealth v. Myers*, 164 A.3d 1162, 1173 (Pa. 2017). "The opportunity to make a knowing and conscious choice—to decide whether to provide actual, *voluntary* consent or to exercise the right of refusal—is essential in every situation in which police officers seek to rely upon the implied consent law instead of upon a search warrant." *Id.* at 1177 (emphasis added); *see also id.* at 1180-81. Thus, "[l]ike any other search premised upon the subject's consent, a chemical test conducted under the implied consent statute is exempt from the warrant requirement only if consent is given voluntarily under the totality of the circumstances." *Id.* at 1180.

> While there is no hard and fast list of factors evincing voluntariness, some considerations include: 1) the defendant's custodial status; 2) the use of duress or coercive tactics by law enforcement personnel; 3) the defendant's knowledge of his right to refuse to consent; 4) the defendant's education and intelligence; 5) the defendant's belief that no incriminating evidence will be found; and 6) the extent and level of the defendant's cooperation with the law enforcement personnel.

*Commonwealth v. Miller*, 186 A.3d 448, 451 (Pa. Super. 2018) (citation omitted).[5]

During the suppression hearing, Officer Morehead testified that at approximately 3:00 p.m. on June 2, 2019, he was dispatched to a motorcycle accident with injuries. N.T. (Suppression), 11/25/19, at 4-5. When he arrived at the scene, Officer Morehead observed Fowler, sitting near his motorcycle on the shoulder of the road, with an injury to his right leg. *Id.* at 5, 6 (wherein Officer Morehead testified that, when he arrived at the scene, paramedics were working with Fowler). Officer Morehead testified that he asked Fowler basic identification questions at the scene, and noticed the odor of alcohol on Fowler's breath. *Id.* at 6. According to Officer Morehead, Fowler was lucid and responsive, despite the pain from his injuries. *Id.*

Fowler was then transported to York Hospital, and Officer Morehead followed the ambulance. *Id.* at 7. Officer Morehead testified that he spoke with the paramedic, who indicated that Fowler had received two shots of fentanyl for his pain during transport. *Id.* at 7-8; *see also id.* at 12 (wherein, after being asked whether he knew how much fentanyl had been administered, Officer Morehead stated, "I think it was like 50 or something at

---

[5] In his appellate brief, Fowler states that his argument focuses on the third factor, *i.e.*, whether he had knowledge of his right to refuse consent. Brief for Appellant at 12.

a time.").[6]  Officer Morehead stated that he read the required DL-26B form to Fowler in the emergency room.  *Id.* at 7.  According to Officer Morehead Fowler indicated that he understood the warnings contained in the DL-26B form, and verbally consented to submit to a blood test.  *Id.* at 7, 10; *see also id.* at 9 (wherein Officer Morehead explained that Fowler was unable to sign the DL-26B form because he was strapped to the stretcher at the time).  Officer Morehead opined that Fowler was not "manifestly" under the influence of controlled substances when he agreed to submit to a blood test.  *Id.* at 10.  Officer Morehead also testified that there was "pain behind" Fowler's responses, but he indicated that Fowler was lucid and responsive at that time.  *Id.*

Fowler testified that he could not remember anything after his arrival at the hospital, and could not recall having a conversation with Officer Morehead.  *Id.* at 14.  Danielle testified that after the paramedics administered fentanyl, Fowler "shortly [] dozed off[.]"  *Id.* at 17.  Danielle described Fowler as being "loopy" and "like he was kind of dream talking."  *Id.* at 18.

Here, the suppression court determined that Fowler "voluntarily gave verbal consent that authorized Officer Morehead to retrieve a sample of his

---

[6] We note the discrepancy between the suppression court's finding that Fowler received 50 mg of fentanyl *total*, and Officer Morehead's testimony that, according to his belief, Fowler received two doses of fentanyl, which was administered 50 mg *at a time*.  However, the quantity of the fentanyl does not affect our analysis.

blood for chemical testing." Suppression Court Opinion, 12/4/19, at 6. The suppression court specifically concluded that, despite Fowler's assertions, the testimony presented by Officer Morehead "shows that [Fowler] gave clear consent to have his blood drawn." *Id.*

Significantly, in his brief, Fowler concedes that he was conscious. Brief for Appellant at 17. *Cf. Myers*, 164 A.3d at 1181 (holding that an unconsciousness defendant was unable to provide voluntary consent to a blood draw); *Jones-Williams*, 237 A.3d at 531-31, 543 (concluding that a defendant who was "fading in and out of consciousness," and whom the investigating police sergeant therefore could not interview, did not voluntarily consent to a blood draw). Thus, the evidence presented during the suppression hearing, viewed in the light most favorable to the Commonwealth as the verdict winner, establishes that Fowler was conscious at the hospital, and spoke to Officer Morehead about the DL-26B form. There is no indication that Officer Morehead questioned Fowler's ability to provide voluntary consent. *See Commonwealth v. Benvenisti-Zarom*, 229 A.3d 14, 23 (Pa. Super. 2020) (concluding that the record supported a finding that the appellant had voluntarily consented to a blood draw, despite speaking with the trooper after receiving a dose of fentanyl, where the appellant was conscious and spoke to the trooper, and the trooper expressed no reservations about her ability to consent). The record supports the suppression court's

determination that Fowler voluntarily consented to the blood draw. Thus, the suppression court did not err in denying Fowler's Motion to Suppress.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/02/2021